ggc

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

In re:                              )
                                    )
**MICHAEL WOLTERS,**                )
**CONNIE WOLTERS and**              )
**ERIC C. RAJALA, Trustee,**        )
                                    )
            **Appellants,**         )
                                    )
vs.                                 )        **Case No. 10-2626-JAR**
                                    )
**BENNIE ARTHUR LAKEY, SR. and**    )
**GERAL DINE LAKEY,**               )
                                    )
            **Appellees.**          )
_____)

### MEMORANDUM AND ORDER

This matter comes before the Court on appeal from the bankruptcy court's October 4,

2010 Order Overruling Joint Objection to Homestead Exemption filed by appellants Michael and

Connie Wolters and the Chapter 7 Trustee Eric C. Rajala ("Appellants" or "Wolters").   The

bankruptcy court's order overruled the Wolters' objection to the homestead exemption filed by

Debtors Bennie Arthur Lakey, Sr., and Geral Dine Lakey ("Appellees" or "Lakeys").   For the

reasons explained in detail below, the Court affirms the bankruptcy court's order.

### I. Appellate Jurisdiction

The Appellees have elected to have the appeal heard by this Court.[1]  The appeal was

timely filed by the Appellants, and the bankruptcy court's order is "final" within the meaning of

28 U.S.C. § 158(a)(1).[2]

---

[1] *See* 28 U.S.C. § 158(c)(1); B.A.P. 10th Cir. R. 8001–1(a), (e).

[2] *See* Fed. R. Bankr. P. 8001–8002.

## II. Standard of Review

On appeal from the bankruptcy court, the district court sits as an appellate court.[3]  The standards generally governing review of the bankruptcy court's decision are well-settled: findings of fact are not to be set aside unless clearly erroneous; conclusions of law are reviewed *de novo.*[4]

## III.  Factual Background

On August 7, 2009, the Lakeys filed a Chapter 7 bankruptcy and claimed a homestead exemption for their home in Lenexa, Kansas (the "Sunset Property").  The Wolters and the Trustee filed an objection to this homestead exemption under 11 U.S.C. § 522(o).  The bankruptcy court held a four day evidentiary hearing on the matter.  In overruling the objection, the bankruptcy court found that (1) the Wolters failed to meet their burden to prove grounds justifying piercing the corporate veil of Colony North Homes, Inc.—the Lakey-owned entity that constructed the Wolters' home—to make the Wolters creditors of the Lakeys; and (2) even if the Wolters were creditors of the Lakeys, the timing of the Lakeys' homestead acquisition did not show that the Lakeys acquired or encumbered their homestead with the intent to hinder, delay or defraud the Wolters or any other creditors.

Although the parties have not stipulated to the facts in this case, they have acknowledged that for the most part, the "facts are not in dispute."[5]  Therefore, after reviewing the record and

---

[3] *See* 28 U.S.C. § 1334(a).

[4] *Va. Beach Fed. Sav. & Loan Ass'n v. Wood,* 901 F.2d 849, 851 (10th Cir.1990); *In re Barber,* 191 B.R. 879, 882 (D. Kan.1996); *see* Fed. R. Bankr. P. 7052, 8013.

[5] *See* Doc. 18 at 1; Doc. 19 at 1.

the parties' briefs, the Court finds that, except as noted below, the bankruptcy court's factual findings are accurate and supported by the record as set forth below.[6]

### A. Introduction

Debtors Bennie Lakey and Geral Lakey filed for bankruptcy on August 7, 2009.  Mr. Lakey built upper-end homes and enjoyed a good reputation in his field for over thirty years. According to his banker, Lakey-built homes consistently sold over their appraised value because of their high quality.  The Lakeys resided in Kansas City, Missouri, and Mr. Lakey conducted business predominantly in the Kansas City North area.  Mr. Lakey used a number of business entities to conduct his business.  These entities included Colony North Homes, Inc., Colony North Construction, Inc., The Lakey Co., Inc., Lakey Design Build, Inc., Lakey Custom Building, Inc., L&L Development, Inc., 6000 N. Oak, Inc., Lakey Enterprises, Inc., Petra Properties, Inc., Pinnacle Properties I, Inc., Tremont Manor Development Co., Inc., and Quality Plus Homes, Inc.  Each business had a purpose: some were holding companies, some acquired real estate, some developed subdivisions and built homes.

In the late 1990s and early 2000s, the Lakey entities began to struggle financially.  The Lakey companies collectively suffered six-figure losses each year for several years in the late 1990s.  Mr. Lakey thought he saw better business opportunities across the state line in Kansas. By 2001, the Lakeys decided to move to Kansas.

### B. The Wolters Dispute

On August 1, 2001, the Wolters entered a construction contract with Lakey-owned Colony North Homes, Inc., to build the Wolters' home for a price of $871,708.  Wolters

---

[6] The bankruptcy court's factual summary is set forth in its opinion at *In re Lakey,* Case No. 09-22538-7 (Bankr. D. Kan. Oct. 4, 2010).  Footnotes have been added by this Court.

closely scrutinized the construction and did not get along with Colony North Homes' supervisor. In April 2002, the Wolters complained the $60,000 windows they chose were distorted.[7]  In November 2002, the Wolters sued Colony North Homes over the windows.  By December 2002, the Wolters' list of complaints included insufficient framing, plastic plumbing, and a substandard gas line.  In January 2003, the state court ordered the parties to arbitration.

The state court proceeding and the arbitration were contentious.  The Wolters were completely dissatisfied with their windows and refused to allow Colony North Homes to attempt to remedy their other complaints.  Colony North Homes adamantly maintained that the windows were not defective and that all other complaints could be remedied for approximately $7000. After another home builder was chosen as the arbitrator, Colony North Homes sought to have him disqualified because he was a competitor of Mr. Lakey.  The request was ultimately denied on August 15, 2003, and the bankruptcy court found that arbitration began in February 2004.[8]

Also in February 2004, Mr. Lakey took steps to merge Colony North Homes, a Missouri corporation, with Lakey-owned Colony North Construction, a Kansas corporation.  Mr. Lakey intended to use Colony North Construction to begin building in Kansas.  However, on October 4, 2004, Colony North Construction fdba Colony North Homes filed for Chapter 7 bankruptcy, faulting the Wolters litigation for its demise.  A few days later in October 2004, the arbitrator issued a $600,000 award against Colony North Homes.  Colony North Homes

---

[7] The Appellants argue that the bankruptcy court erred by stating that "In April 2002, the Wolters complained the $60,000 windows they chose were distorted."  Appellants allege that this was not the first time the Wolters made such a complaint; they first complained about the windows in December 2001.  Because the bankruptcy court did not say that April, 2002 was the *first* complaint and the Appellants have not asserted that the time difference is material or relevant in any way, the Court finds that the distinction is immaterial.

[8] The Appellants also argue that the bankruptcy court erred by stating that the arbitration "began" in February 2004, because it actually began in October of 2003.  The arbitration was still ongoing during February of 2004, and again the Appellants have failed to assert why the difference in time is material.

attempted to have the arbitration award declared void for having been entered in violation of the stay. The bankruptcy court found that the award was not entered in violation of the automatic stay, and that even if it were, the Wolters were granted retroactive and prospective relief to seek confirmation of the award in state court. In January 2005, Colony North Homes moved to vacate the arbitration award, alleging the arbitrator was biased against Mr. Lakey, but the state court ultimately confirmed the award in September 2007. The Wolters sued Mr. Lakey in November 2007, seeking to pierce Colony North Homes' corporate veil. The Wolters added Mrs. Lakey as a defendant in March 2009.

Mr. Lakey testified that he fought the arbitration award on principle because he thought the arbitrator, as a competitor, was biased against Mr. Lakey. Mr. Lakey spent his personal funds for Colony North Homes' legal fees. Mr. Lakey testified he could not believe and never expected the arbitrator to enter an unexplained $600,000 award against Colony North Homes.[9]

### C. More Facts Pertaining to Colony North Homes

Colony North Homes was created in September 1998 to construct homes in the Northland.[10] Mr. Lakey and Mrs. Lakey contributed $500 to its initial capitalization. The Lakeys were the sole shareholders, officers, and directors. Colony North Homes reported tax losses seven of the eight years it existed. The bankruptcy court found that in late 2003, the Lakeys loaned Colony North Homes about $678,000, and at the time, Colony North Homes was holding a note from the Lakeys in the amount of $315,000, so the $678,000 loan netted the

---

[9] The bankruptcy court noted that the award is one page and is not itemized.

[10] The bankruptcy court described the Northland as the northern portion of the Kansas City, Missouri, metropolitan area that also encompasses suburban development.

corporation approximately $365,000.[11]  The Wolters' experts surmised the loan was made to reduce the Lakeys' personal tax liability.  Shortly thereafter, Colony North Homes merged with Colony North Construction and eight months later filed for Chapter 7 bankruptcy.  Mr. Lakey was listed as a creditor owed $486,000 by Colony North Construction.

Colony North Homes kept formal corporate records, minutes, financial statements, and tax returns.  The financial statements show sloppy accounting, and the balance sheets usually did not balance; however, Colony North Homes was a separate and distinct entity from the Lakeys.  Except for the $315,000 loan to shareholders, which was documented and repaid, the record does not contain any evidence the Lakeys used Colony North Homes' assets for personal expenses.  The bankruptcy court found that there was no evidence of co-mingled assets, improper dividends, or improper siphoning[12] of corporate funds or assets.  On balance, the record shows money flowed from the Lakeys, personally, into the corporation, ultimately culminating in a six-figure loss to the Lakeys.

There is no evidence that Mrs. Lakey was involved in Colony North Homes other than as a stockholder.  Wolters testified he never had any business dealings with Mrs. Lakey.  He barely knew her.  There is no evidence Mrs. Lakey exerted any control over Colony North Homes or participated in its business.

In 2004, Mr. Lakey began winding down many of his businesses in preparation for retirement.  The Lakeys reduced the number of entities they owned from ten to four.   The

---

[11] The Appellants allege that the bankruptcy court erred in finding that the Lakeys loaned Colony North Homes $678,000 in 2003.  This argument will be addressed in this Court's analysis, along with the other allegations by the Appellants that relevant facts were omitted from the bankruptcy court's analysis.

[12] Appellants allege that the bankruptcy court erred in finding that there was no evidence of improper siphoning.  This argument will be addressed in this Court's analysis.

Colony North Homes merger with Colony North Construction was part of the restructuring.

### D. Details of Debtors' Acquisition of the Sunset Property

In May 2001, The Lakey Company purchased a lot on 139th Terrace in Kansas for the construction of the Lakeys' personal retirement home.  In October 2001, The Lakey Company purchased an option to buy another Kansas lot known as the Sunset Property.  The Sunset Property ultimately became the Lakeys' homestead and is the subject of this objection.  With the Sunset Property, The Lakey Company optioned other lots in the same subdivision for future business development.

On February 14, 2002, the Lakeys moved into a home on 141st Street located directly behind their 139th Terrace construction site.  Mr. Lakey testified he originally intended the 139th Terrace home to be a $1.3 million custom-build.  However, over the summer of 2002, the Lakeys became dissatisfied with the location.  The Lakeys thought the neighbor complained excessively about their construction and feared the relationship would never be friendly.  Mr. Lakey decided to finish the home for sale rather than as his personal residence.

In August 2002, the Lakeys decided to develop the Sunset Property for their personal retirement home instead.  On September 3, 2002, The Lakey Company borrowed $980,000 from North American Savings Bank ("NASB") to begin construction.  A year later, on September 30, 2003, the Lakeys purchased the Sunset Property from The Lakey Company and titled it in their names.  The Lakeys paid $1.67 million in cash.  Of the purchase price, $1,109,892.50 paid off the construction loan to NASB.  Mr. Lakey testified he did not remember exactly where the cash came from, but he believed he cashed in certificates of deposit from seven banks and drew from

his cash deposits with NASB.[13]   The money in these accounts may have come, in part, from the 2002 sales of commercial buildings owned by Petra Properties and Pinnacle Properties, two of the Lakeys' companies.

Mr. Lakey testified the reason he purchased a Kansas homestead for cash was because he and his wife wanted to live closer to family, and Mr. Lakey had promised Mrs. Lakey a mortgage-free home in retirement.   Brad Lee, a former NASB banker who managed the Lakey relationship, and NASB internal emails dating from August 2002, corroborated Mr. Lakey's testimony.

### E. The Lakeys' Bank Deposits and Obligations

The Lakeys' primary lender was NASB.   Several Lakey-owned entities borrowed money from NASB to acquire real estate and to finance construction projects.   The Lakeys personally guaranteed $2 to $4 million in loans as a matter of course.   The loans were also secured by the real estate developments they financed.   Lee testified Mr. Lakey and his companies were longtime clients who were well-regarded both at the bank and in the community.   The Lakeys consistently maintained cash deposits with NASB in the million dollar range, making them attractive borrowers.   The Lakeys maintained high liquidity between 1998 and 2003; however, when Lee heard the Lakeys were moving to Kansas, he thought the move could be a precursor of bankruptcy.   Still, in 2004, the Lakeys and Lakey-owned entities averaged $1.3 million in bank deposits.   In December 2005, the Lakeys had over $500,000 in the bank.

In February 2007, the Lakeys and NASB wrapped up their lending relationship and the

---

[13] The bankruptcy court noted that even though § 522(o) has a ten-year look-back, bank records are only available for the past seven years.

Lakeys surrendered $1.6 million in real estate by deed in lieu of foreclosure.[14]  NASB is not a creditor in this bankruptcy proceeding.  Mr. Lakey has since retired.

### F. Debtors' Disposition of Non-Exempt Assets

Between 2002 and 2006, the Lakeys and Lakey-owned entities began to sell assets without reinvesting the net proceeds in business properties.  The 139th Terrace property, the 141st Street property, a Branson condo, and three commercial buildings were sold and the money was not reinvested in any other real estate.  In total, these sales generated $690,602.09 in net proceeds.

In December 2004, just days after the Lakeys failed to have the arbitration award declared void in Colony North Homes' bankruptcy, the Lakeys purchased whole life insurance policies for $600,000.  The Lakeys included a $35,000 deduction on their 2005 tax return for money spent on "protection of assets."  The bankruptcy court found that prudent business persons, including those who are financially successful, consult with professionals regarding the protection or, in essence, the retention of assets to provide financial security for their families.  The Lakeys' conversions of non-exempt assets to exempt assets, including the homestead, occurred at least two years before the Wolters' assertion of any personal liability for corporate debts against Mr. Lakey via a lawsuit filed in November 2007.[15]  It was in September 2003 that the Lakeys purchased their homestead, the construction of which had actually started in September 2002 by a Lakey entity.

In 2008, the Lakeys forgave a five-year-old $100,000 note payable from the Lakeys'

---

[14]  The Lakeys surrendered property worth $7 million that was encumbered with $5.4 million in debt, leaving an equity of $1.6 million.  Doc. 3-152 at 139.

[15] The bankruptcy court noted that the lawsuit was amended to add Mrs. Lakey in March 2009.

church.  Mr. Lakey testified the note was always meant as a charitable contribution.  Mr. Lakey structured it as a note to obtain a tax deduction in the year of his choice rather than the year of the donation.

By the time they filed for bankruptcy, the Lakeys claimed $1,757,261.12 in exempt assets, including just over $1 million as their homestead exemption.  Their homestead was and remains encumbered with a reverse mortgage, which had a balance of about $360,500 in secured debt as of the petition date.  The Lakeys listed $2,400 a month in Social Security income, but claimed monthly expenses totaling $5,523.  The Lakeys' Schedule J neglected to include approximately $25,000 in real estate taxes the Lakeys owe annually.  The Lakeys pay their day-to-day living expenses with either credit cards or draws on the reverse mortgage.  The parties presented no evidence that any surviving Lakey-owned entities have any value or assets.

**IV. Analysis**

The Appellants argue that the bankruptcy court committed three major errors in finding that the Wolters were not creditors of the Lakeys' bankruptcy estate and that the Lakeys were entitled to their homestead exemption under 11 U.S.C. § 522(o).  First, they argue that the bankruptcy court erred as a matter of law in applying Kansas law rather than Missouri law in determining whether to pierce Colony North Homes' ("CNH") corporate veil.  Second, they argue that the bankruptcy court erred by ignoring uncontroverted facts that, pursuant to Missouri law, lead to the inevitable conclusion that the Wolters were creditors of the Lakeys.  Finally, they argue that if the bankruptcy court had properly determined that the Wolters were creditors of the Lakeys, then it would have reached the conclusion that the Debtors put their non-exempt assets into their Sunset Property with intent to hinder, delay and defraud both the Wolters and

10

NASB, who were the Lakeys' two major creditors at the time.

### A.  THE BANKRUPTCY COURT'S FINDING THAT THE WOLTERS ARE NOT CREDITORS OF THE LAKEYS

Appellants argue that the bankruptcy court erred as a matter of law in applying Kansas, rather than Missouri, law to determine whether to pierce CNH's corporate veil.[16]  CNH was a Missouri corporation, the parties were Missouri residents that contracted in Missouri to build a home in Missouri.  Thus, all the relevant events occurred in Missouri.  But, assuming for purposes of this appeal that Missouri law would apply in this case, Appellants have not shown that the bankruptcy court's conclusion that there is an insufficient basis to pierce the corporate veil, is erroneous.

Appellants cite Missouri's tripartite test, as set forth in its leading case, *Collet v. American National Stores, Inc.,*[17] which disregards the corporate veil when the following three elements are met:

> 1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
> 2) Such control must have been used by the corporation to commit fraud or wrong, to perpetrate the violation of statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
> 3) The control and breach of duty must proximately cause the injury or unjust loss

---

[16] The bankruptcy court considered the following eight factors: (1) undercapitalization of a one-man corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant shareholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; (7) the use of the corporation as a facade for operations of the dominant shareholder; and (8) the use of the corporate entity in promoting injustice or fraud.  *See In re Lakey,* Case No. 09-22538-7 at 8 (Bankr. D. Kan. Oct. 4, 2010) (citing *In re Anderson,* 386 B.R. 315, 326 (Bankr. D. Kan. 2008)).

[17] 708 S.W.2d 273 (Mo. Ct. App. 1986).

complained of.[18]

The Lakeys argue that Missouri's three part test is embodied in the eight factors used by the bankruptcy court and its review of the broad factors supports the same conclusion under Missouri law.  The Appellants acknowledge the overlap between both, but focus on the second prong of the *Collet* test and argue that the bankruptcy court should have found that CNH's undercapitalization satisfied this prong.

Appellants argue that the bankruptcy court erred when it concluded that CNH was adequately capitalized.  They argue that Missouri courts give more weight to undercapitalization, noting that Missouri courts routinely pierce the corporate veil of undercapitalized corporations because "undercapitalization is circumstantial evidence of an improper or reckless disregard for the rights of others."[19]  Even if Missouri courts have inferred fraudulent intent from undercapitalization, they have also recognized that there are cases where the evidence does not support such an inference.[20]

There must be some evidence to support an inference of fraudulent intent from undercapitalization, and even under *Collet*, some evidence of improper motive is required to satisfy one of the elements necessary for piercing the corporate veil.  Courts have used the term "undercapitalization" as a sort of proxy for the second element of the *Collet* formulation – improper motive.[21]

_____

[18] *66, Inc. v. Crestwood Commons Redev. Corp.*, 998 S.W.2d 32, 40 (Mo. 1999) (citing *Collet,* 708 S.W.2d at 284).

[19] *See Haynes v. Edgerson,* 240 S.W.3d 189, 197 (Mo. Ct. App. 2007) (citation omitted).

[20] *See Iridex Corp. v. Synergetics USA, Inc.,* 474 F. Supp. 2d 1105 (E.D. Mo. 2007) (holding that there was no evidence to support an inference of fraudulent intent from undercapitalization).

[21] *Radaszewski v. Telecom Corp.*, 981 F.2d 305, 307 (8th Cir. 1992), *cert. denied* 508 U.S. 908 (1993).

> The reason . . . is not because undercapitalization, in and of itself, is unlawful (though it may be for some purposes), but rather because the creation of an undercapitalized subsidiary justifies an inference that the parent is either deliberately or recklessly creating a business that will not be able to pay its bills or satisfy judgments against it.[22]

The whole purpose of asking whether a corporation is "properly capitalized," is to determine its "financial responsibility."[23]

If a corporation is financially responsible, whether by means of insurance or otherwise, the policy behind the second part of *Collet* is met.[24]  A healthy balance sheet is not the only way to meet this policy.  In *Radaszewski*, the court held that where the corporation had liability insurance available to pay judgments, no one could claim that the parent corporation was improperly motivated in setting up its subsidiary, in the sense of either knowingly or recklessly establishing it without the ability to pay tort judgments.[25]  This was the case even though the subsidiary was undercapitalized in the accounting sense; most of the money contributed to its operation was in the form of loans from its parent corporation; its balance sheet was anemic; and from the point of view of generally accepted accounting principles it was inadequately capitalized.[26]  Likewise, in *Jackson v. O'Dell*, the court affirmed the trial court's refusal to pierce the corporate veil of a home builder, finding that:

> Although the corporation was formed with only $600.00 of stock subscriptions, it was apparent from the start that each of the three shareholders would be required

---

[22] *Id.* at 308.  The same reasoning would apply whether or not the shareholder is an individual or a parent corporation.

[23] *Id.* at 309.

[24] *Id.*

[25] *Id.* at 308.

[26] *Id.*

to personally guarantee any loans obtained from the bank for the construction of houses.  Thus, each shareholder would have a substantial personal stake in the success of the corporation, as though a larger amount of capital had been contributed.[27]

In this case, although CNH may appear to have been undercapitalized in the accounting sense, there is no evidence of improper motive in setting up the corporation, in the sense of either knowingly or recklessly establishing it without the ability to pay potential judgments. CNH's federal tax returns showed that, except for 2003, the company was regularly losing money; its balance sheets did not tie-in year to year and did not balance; and both of the Wolters' experts testified that it reflected very poor accounting.  However, the bankruptcy court expressly rejected the undercapitalization argument and found that CNH was established for a legitimate business purpose and had sufficient funds to operate for eight years; Mr. Lakey enjoyed a good reputation in his field for over thirty years and his homes consistently sold for over their appraised value because of their high quality; the Lakeys personally guaranteed $2 to $4 million in corporate loans as a matter of course; the loans were also secured by the real estate developments they financed; Mr. Lakey and his companies were long-time clients of NASB who were well-regarded both at the bank and in the community; the Lakeys consistently maintained cash deposits with NASB in the million dollar range, making them attractive borrowers; and the Lakeys and NASB wrapped up their lending relationship and NASB is not a creditor in this bankruptcy proceeding.

The fact that the Wolters were unable to collect on their unforeseeable arbitration award does not furnish support for an inference of improper motive.  CNH had sufficient funds to

---

[27] *Jackson v. O'Dell*, 851 S.W.2d 535, 537 (Mo. Ct. App. 1993).

operate for eight years and until the dispute with the Wolters, the Lakey entities had only

experienced typical disputes that any builder would routinely face.  There was no history or

pattern of dissatisfaction by CNH's customers.  The Wolters' dispute proved to be an anomaly

only after CNH could not remedy or ultimately pay an unusually high damage award.  Mr. Lakey

testified that he could not believe and never expected the arbitrator to enter an unexplained

$600,000 award against CNH.  "[U]ndercapitalization does not simply mean that a company

might not have ready cash on hand in whatever amount a plaintiff thinks is necessary to satisfy

that plaintiff's damage claims."[28]  In *Radaszewski*, the fact that the insurance carrier became

insolvent did not affect the court's decision, which noted that events occurring thereafter are of

"tenuous relevance to [the subsidiary's] state of mind at the time of the purchase of the

insurance."[29]  In discussing the test of capital adequacy at the corporation's inception and

evaluating its amount in terms of the magnitude of future business risks, one commentator has

noted:

> Are the risks to be perceived only those that are normal for a business, or do they
> include a highly unusual tort claim that greatly exceeds the firm's liability
> insurance?  Does the test demand that the total amount the shareholders invest
> must literally equal the present value of all future liabilities of the firm or does it
> entail some lesser amount that is simply necessary to launch the firm such that its
> future cash flows will meet its normal operating expenses?  The former is clearly
> an unreasonable demand because no company can be expected to endow its future
> operating expenses and liabilities as a precondition to opening its doors.  As for
> gauging capital adequacy in terms of massing assets sufficient to generate
> positive cash flow, it must be borne in mind that the mere fact a business fails in
> terms that it produced a negative, rather than a positive, cash flow is customarily
> explained by a good many factors other than the relative amount invested in the
> firm.  And to require an investment that assures a positive cash flow surely will
> have a chilling effect on entrepreneurial activity because a central risk of any

---

[28] *Iridex Corp. v. Synergetics USA, Inc.*, 474 F. Supp. 2d 1105, 1109-10 (E.D. Mo. 2007).

[29] *Radaszewski,* 981 F.2d at 310.

business venture is that it will not, because of competition and other market forces, be able to generate a cash flow sufficient to support itself.  It would therefore appear that inadequate capitalization has correctly assumed a limited role in veil-piercing cases, that of being a surrogate for the probable bad faith of the firm's promoters.[30]

The Appellants' allegations that the Lakeys took actions that were imprudent or did not make good business sense are also insufficient.  Errors in business judgment do not furnish support for an inference of improper purpose.[31]  The bankruptcy court's findings support the absence of that "something more" that is required to meet the test set forth in *Collet*.  In *Radaszewski*, the court held that:

> The doctrine of limited liability is intended to precisely protect a parent corporation whose subsidiary goes broke.  That is the whole purpose of the doctrine, and those who have the right to decide such questions, that is, legislatures, believe that the doctrine, on the whole, is socially reasonable and useful.  We think that the doctrine would largely be destroyed if a parent corporation could be held liable simply on the basis of errors in business judgment.  Something more than that should be shown, and *Collet* requires something more than that.[32]

The Appellants allege that stripping assets to avoid the demands of creditors can satisfy the second element of *Collet*.  The bankruptcy court found that the record showed no improper siphoning of funds or assets; that not one CNH asset was traced to the Lakeys' homestead; and that the Lakeys did not use corporate funds to pay their personal debts.  The bankruptcy court found that the Wolters did not prove that Mr. Lakey improperly took money or assets out of CNH to thwart the Wolters' claim.  The bankruptcy court found that the only loan to the Lakeys as

---

[30] James D. Cox and Thomas Lee Hazen, *Inadequate Capitalization as a Factor for Piercing the Veil*, 1 Treatise on the Law of Corporations § 7:11 (3d) (2011) (citations omitted).

[31] *Radaszewski,* 981 F.2d at 311.

[32] *Id.*

shareholders in the amount of $315,000 was repaid.  The bankruptcy court found that in 2003 the

Lakeys loaned CNH $678,000, which netted the corporation approximately $365,000.  The

Wolters dispute this finding, arguing that the $678,000 amount was a cumulative loan amount

based on the life of the company, not representative of loans only made in 2003.  Appellants

allege that the bankruptcy court erred because CNH's general ledger indicated that the Lakeys

only loaned it $88,000 in 2003, although there were promissory notes totaling $118,000 for that

year.

Appellants concede that with regard to the general ledger, the bankruptcy court stated that

it was "not inclined to give more weight to these documents than the tax returns that were

prepared by Keller & Owens and filed with the federal government."[33]  However, Appellants

argue that the tax returns also support the conclusion that the numbers are cumulative.  Appellants

do not dispute that, on a cumulative basis, the Lakeys loaned CNH $678,532 that was outstanding

in 2003 and that the Lakeys borrowed $315,000 from CNH that was outstanding in 2003.  Rather,

their argument is that the transactions did not all take place in 2003.  They allege that "the

Lakeys' main argument in support of adequate capitalization focuses on the 2003 timeframe."[34]

They allege that of the $678,532 loaned to CNH by the Lakeys, only $68,556 was actually loaned

in 2003, and the $315,000 loan to the Lakeys occurred in 2002, not 2003.  Appellants argue that

in addition to the $315,000 loan to the Lakeys in 2002, they also received an additional $200,000

from the company that the bankruptcy court failed to consider.  Mr. Lakey testified that they were

either loan repayments or retained earnings.  Because the bankruptcy court looked at the net

---

[33] Doc. 3-153 at 18.

[34] Doc. 19 at 5.

effect of the outstanding loans, the Court cannot find that the bankruptcy court erred by failing to mention the transfer in its opinion.

Regardless of whether or not the bankruptcy court erred in finding that the loan transactions occurred in 2003 only or over the life of the corporation, as a result, $465,000 of liabilities went to CNC when it merged with CNH in February 2004.  The bankruptcy court found that Mr. Lakey was listed as a creditor owed $486,000 in CNC's bankruptcy.  Basically, Appellants' argument for improper siphoning is based on the Lakeys' reduction of the amount of their outstanding loan to CNH.  They note that: "Loans from Shareholders at 12-31-2001 of $755,764[35] versus net loans at 12-31-2002 of $294,976 (i.e. Loans from Shareholders $609,976 – Loans to Shareholders $315,000) equals a reduction of loans of $460,788 (i.e. $755,764 – $294,976)."[36]  This reduction would have been created by the $315,000 loan to shareholders, plus an additional reduction of $145,788.  The bankruptcy court's failure to address in its order the additional $200,000 amount that the Appellants claim the Lakeys also received in 2002 (in addition to their $315,000 loan) could be explained by this additional reduction in CNH's outstanding loan to the Lakeys, especially in light of the bankruptcy court's finding that the general ledgers were not reliable.  Appellants' argument regarding the reduction in outstanding loans also fails to note that the Lakeys loaned CNH at least an additional $68,556 in 2003.

Even if this reduction qualifies as "siphoning," it still must be shown to be improper.  The bankruptcy court specifically found that "[t]here is no evidence of co-mingled assets, improper dividends, or improper siphoning of corporate funds or assets.  On balance, the record shows

---

[35] Interestingly, the Appellants argue that there was $755,764 in outstanding loans from shareholders to CNH in 2001 – the year the Wolters voluntarily contracted with CNH.

[36] Doc. 19 at 11, n. 51.

money flowed from the Lakeys personally, into the corporation, ultimately culminating in a six-figure loss to the Lakeys."[37]  The bankruptcy court was aware of the net effect of these loans and found that "on the balance" the Lakeys suffered a six-figure loss.  The bankruptcy court asked for clarification on this subject during direct examination of the Wolters' expert witness, and there is support in the record for the bankruptcy court's finding that these offsets were not improper.[38]  The bankruptcy court conducted its own extensive questioning of the expert witness on this very issue:

> The Court: Okay, would you clarify this for me.  We have the $315,000 loan to shareholders in Colony North Homes, Inc., correct?  That is the loan from the company to shareholders.
> The Witness: That is correct.
> The Court: And then we have the $600,000 plus loan from shareholders to the company?
> The Witness: That is correct.
> The Court: Right.  And when you say they netted it, of course, they reduced the $600,000 plus by the $315,000?
> The Witness: That is correct.
> The Court: And this was netted in what manner, via the merger?
> The Witness: I don't believe so, I believe they were netted prior to the merger.
> The Court: So, there is nothing really improper with that, is there?
> The Witness: I believe there is a reason why they had a due to the shareholder and a due from the shareholder, it has to do with deductibility of the losses for Colony North Homes in 2002 and 2003.
> The Court: So it is a tax matter?
> The Witness: That is the way it looks to me.  They created a $315,000 due from shareholder so that due to shareholder – excuse me, it is the other way around.  They created $315,000 due from the shareholder so the due to shareholder would be that much larger.  In an S corporation, shareholders get basis for capital contributed and direct loans from shareholders to the corporation.
> The Court: So the stock basis is increased in fact, by loans to the corporation?
> The Witness: It's not stock basis, but it's basis that you are allowed to deduct

---

[37] *In re Lakey*, Case No. 09-22538-7 at 4 (Bankr. D. Kan. Oct. 4, 2010).

[38] *See In re Davis,* 239 B.R. 573, 577 (10th Cir. BAP 1999) (reviewing court has authority to look to facts not specifically mentioned by the bankruptcy court that are in the record in order to find further support for the bankruptcy court's factual findings and inferences) (*citing In re Sampson*, 997 F.2d 717, 721 (10th Cir. 1993)).

losses on your personal 1040.
The Court: So basis for purposes of the flow through and deductibility of net
losses?
The Witness: That is correct.
The Court: All right.  One moment, please.  So that is really just a bookkeeping
issue though, isn't it?  Because they are going to be set off anyway irrespective.
You have a net loan of around $300,000 owed to the shareholders by the company.
So that is what can be deducted.
The Witness: It is a timing issue and it affects when you take your deductions.[39]

The bankruptcy court concluded the discussion by finding that it was "not seeing anything

nefarious."[40]

Appellants also argue that the bankruptcy court erred in failing to find that the Lakeys

were alter egos of CNH, again asserting their arguments for a finding of undercapitalization and

improper siphoning.  These issues have already been addressed, and the bankruptcy court further

found that CNH observed corporate formalities and there was no evidence of abuse of the

corporate form.  There were no facts showing deception.  The bankruptcy court did not err in

finding that the Wolters failed to meet their burden to prove that the Lakeys used CNH as a sham

corporation to defraud them.

### B.  THE BANKRUPTCY COURT'S DENIAL OF APPELLANTS' OBJECTIONS TO THE LAKEYS' HOMESTEAD EXEMPTION UNDER 11 U.S.C. § 522(o).

To prevail on an objection to the homestead exemption under 11 U.S.C. § 522(o),[41] the

---

[39] Doc. 3-152 at 179-181.

[40] *Id.* at 189.

[41] Section 522(o)(4) states:
   [T]he value of an interest in . . . real or personal property that the debtor or a dependent of the debtor claims as a homestead . . . shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt . . . if on such date the debtor had held the property so disposed of.

moving party must demonstrate:

> (1) that the debtor disposed of property within the 10 years preceding the filing of the bankruptcy petition, (2) that the proceeds from such disposition were used to increase the value of the debtor's homestead, (3) that the property disposed of was not itself exempt, and (4) that in doing so, the debtor acted with the intent to hinder, delay or defraud a creditor.[42]

The objecting party bears the burden of proof by a preponderance of the evidence.[43]  The critical issue for this appeal is whether the Lakeys intended to hinder, delay or defraud a creditor when they acquired the Sunset Property.

The bankruptcy court, noting that the determination is a fact-intensive inquiry, set forth the various indicia of fraud, and held that the indicia and factors enumerated were not exhaustive and that the question is ultimately whether the debtor is fraudulently attempting to thwart his creditors rather than make an honest attempt to repay them.  The bankruptcy court considered the various factors in light of the facts in this case, and held that the Appellants did not meet their burden of proving intent to hinder, delay or defraud a creditor.

The bankruptcy court found that the Lakeys were already planning to move to Kansas in May 2001, before the Wolters signed their construction contract with CNH in August 2001.  By August 2002, Mr. Lakey told NASB of his intention and NASB was helping him finance the construction of the Sunset Property.  Mr. Lakey testified that the reason he purchased a Kansas homestead for cash was because he and his wife wanted to live closer to family, and he had promised Mrs. Lakey a mortgage-free home in retirement.[44]  Brad Lee, a former NASB banker

---

[42] *In re Keck*, 363 B.R. 193, 208 (Bankr. D. Kan. 2007).

[43] *Parks v. Anderson*, 406 B.R. 79, 96 (D. Kan. 2009).

[44] *Cf. Parks v. Anderson*, 406 B.R. 79, 86 (D. Kan. 2009) (when directly questioned by the bankruptcy court about his motivation in increasing the equity in his homestead, debtor stated "I don't know.").

who managed the Lakey relationship, and NASB internal emails dating from August 2002, corroborated Mr. Lakey's testimony.  The Sunset Property acquisition did not subsume more than half of the Lakeys' net worth at the time.  Not one CNH asset was traced to the Lakeys' homestead, and the Lakeys maintained over a million dollars in liquidity for years after the Sunset Property acquisition.  In November 2002, the Lakeys had $2 million in liquidity and in March 2004, they averaged $1.3 million in the bank even after the homestead purchase.  There was no evidence that the Lakeys misled or deceived a creditor about the conversion of their assets and they did not conceal assets.

Appellants suggest that Mr. Lakey's intent is suspect because he doubled the value of his homestead when he went from the $800,000 home on 139th Terrace to the $1.67 million Sunset Property.  However, Lakey testified that he originally intended the 139th Terrace home to be a $1.3 million custom-build.  Lakey decided to finish the home for sale rather than as his personal residence due to concerns stemming from complaints by the neighbor at the 139th Terrace home. Appellants suggest that Lakey's dissatisfaction with the location is somehow suspect because he did not personally witness the neighbor's excessive complaints.  However, there is no evidence to suggest that it was unreasonable for the Lakeys to decide to change locations based on the information given to them by their sub-contractor who personally witnessed the incidents with the neighbor.  The bankruptcy court did not err in finding that the Appellants failed to prove intent.

Appellants also argue that the Lakeys delayed the arbitration in order to give them more time to acquire their new homestead.  The bankruptcy court found that CNH sought to have the arbitrator disqualified because he was Mr. Lakey's competitor.  Appellants also suggest that the Lakeys' acquisition of the Sunset Property was a "plan to put as much money as they possibly

22

could into a homestead, ride out the problems with Wolters and then downsize their lavish house to a home that could be supported with their existing finances."[45]  They argue that the Sunset Property was to be a "temporary shelter" for their funds.  The Appellants' argument that the Lakeys purposefully delayed the arbitration so that they would have time to spend a full year custom-building their "temporary" new homestead on a lot that they purchased prior to the dispute, does not support a finding that the bankruptcy court clearly erred.  The bankruptcy court did not err in failing to find the requisite intent.

Appellants also argue that the bankruptcy court erred by ignoring material, uncontroverted facts relating to Mr. Lakey's intent based on his knowledge of problems with the Wolters' house.  They allege that the bankruptcy court erred by failing to admit the engineering reports that detailed problems with their home.[46]  The bankruptcy court found that at the operative time, Mr. Lakey thought the dispute with the Wolters involved about $7000 (plus the $60,000 window issue that Lakey disputed).  The Court cannot find that the bankruptcy court erred by making this finding and failing to admit the engineering firm's letters/reports.  The bankruptcy court heard Mr. Lakey's testimony regarding his perception of the amount of the dispute at the operative time, and found it to be credible.  Mr. Lakey controverted the contents of the reports, and the authors of the reports were not there to testify.  This Court cannot find that the bankruptcy court clearly erred.

Appellants also attempt to show intent to hinder or delay creditors by arguing that there

---

[45] Doc. 5 at 4.

[46] The bankruptcy court only admitted the reports for the limited purpose of refreshing Mr. Wolters' recollection while testifying.  They were not admitted to establish the truth of the matters asserted therein.  Doc. 3-150 at 90.

was no business purpose for the merger of CNH and CNC, therefore CNC was a sham with no other purpose than to hinder or delay creditors.  The bankruptcy court found that CNH's merger with CNC was part of the restructuring that was done when the Lakeys began winding down many of their businesses in preparation for retirement.  Appellants have the burden of proof and fail to show how the merger with CNC shows intent to hinder or delay creditors.[47]  The bankruptcy court did not err in finding a lack of intent to hinder or delay creditors.

The bankruptcy court conducted a four day trial with substantial exhibits and the opportunity to assess the credibility of witnesses, resulting in a fifteen page opinion.  The bankruptcy court was able to observe the testimony of both of the Lakeys and found that testimony credible.  This Court cannot find that the bankruptcy court erred in finding that the Appellants did not meet the required burden of proof on their objection to the Lakeys' homestead exemption under 11 U.S.C. § 522(o).

**IT IS THEREFORE ORDERED BY THE COURT THAT** the bankruptcy court's Order Overruling Joint Objection to Homestead Exemption is **AFFIRMED.**

**IT IS SO ORDERED.**

Dated: July 18, 2011

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[47] *See Brown v. E.W. Bliss Co.,* 818 F.2d 1405, 1410 (8th Cir. 1987) (under Missouri law, when two corporations merge, the successor will succeed to the liabilities of the merged corporation); *State v. Commemorative Servs. Corp.,* 823 P.2d 831, 843 (Kan. App. 1991) (surviving corporation from merger assumes all of the liabilities of merged corporation).